Donley v. Attorney General Good morning Your Honors. My name is Michael Tiger from Hughes, Harvard & Mead and I represent the petitioner in this case, Mohamed Abdi-Adel. We reserve three minutes for rebuttal. Mr. Dolly's petition for review is straightforward. Mano Triesman in his home country of Liberia confiscated his land and repeatedly threatened him multiple times with death based on his Mandingo and Muslim status. Wasn't it based on the fact that he ripped down the structure they were building on his land? That's not what the land was originally confiscated and the law is clear, it's clear in the Indashinia case that there must be a mixed motive analysis about whether persecution has occurred. The Indashinia case made clear that it does not need to be the primary reason for there to be an ethnic or religious persecution. It does not need to be the primary reason. It is clear, based on the evidence in the record in this case, both the decades-long persecution that has occurred in Liberia between the models of Mandingo that has really been the hallmark of the history of that nation and both the record developed about Mr. Dolly's persecution specifically, both the confiscation of his land, the repeated theologies in the nature of economic persecution, and threats. What case holds that threats amount to persecution? Well, the law is clear in the Third Circuit that you must look at the total persecution cumulatively. You don't have to look at each case individually, but you can if you're focused on threats. So what are the total threats that were aimed at Mr. Dolly here? What is totality? The most egregious threats are the two death threats that happened within a matter of months in 2008. The first time his girlfriend was told by a group of monetarism men after his land had been confiscated based on his Mandingo-Russell status, the monetarism men told his girlfriend, we're going to come after Mr. Dolly. Sure enough, later that night, they arrived at his mud hut that he put together after his land was confiscated because of his Mandingo Russell status. The monetarism came to escape out the back door. He was chased by two monetarism men. A mob of monetarism men came after him. He ran for the night. Fortunately, he was able to escape their wrath. Who knows what would have happened if they had ever gotten their hands on him. All right. What's the other threat? Then just to continue sort of the narrative from that incident, he immediately fled after sleeping the night at a rubber plantation to go to Monrovia. And is this the threat that occurred at the police station? Well, no, it didn't actually happen at the police station. Prior to the police station? Yes, he actually had gone to a part of Monrovia that was frequented by people from Ganta, his home provincial town. And there, Mr. Dolly's chief, Manuel Antavez, happened to be there. And he grabbed him and said, I am bringing you back to Ganta and killing you. Again, fortunately, Mr. Dolly was able to escape Mr. Jawa's wrath. After that, he hid out in his cousin Mamaday's house and never did not leave the house again until he escaped to America. So those were in and then it seems less. You have been in response to my questions, some of our questions, arguing a lot of the facts in the case. But doesn't much in your position, as you argued, the requirement of the IJ insisted upon after a credibility determination? Exactly. That's a key point in this case. The immigration judge found Mr. Dolly credible. And nevertheless, in violation of clear Third Circuit precedent, the Opolite case, most recently, earlier this year, in the Don case. Well, isn't it appropriate, even with a credibility determination, and I can see this runs counter to every basic evidentiary regime I've understood, but within the immigration context, is it not permissible and appropriate for an IJ to ask for corroboration, notwithstanding a credibility determination? Absolutely. The Real ID Act makes that clear. However, the law is clear. It's part of the three-part abdullite analysis. The immigration judge, as part of her obligation to develop the record, must provide the assignment seeker advance notice of whatever facts. Where is this, where is that in precedential opinions? I think in the Shah case, he says that he denies that. Well, that's a non-precedential opinion. Does that make no sense, advance notice? No. There's a three-part test, and advance notice is not part of it, correct? In the recorded decision, it doesn't say advance notice. Why does it not require the IJ, first of all, to identify the facts that would be necessary for corroboration? At the second. At the second, then, we need to consider them, to take them into account, to speak to them, to analyze them. Are they the one and two of them? In fact, the notice element is important to both of them because it allows the applicant to be able to provide that. No, but there is not a notice requirement in AFJLA. It's where there are facts that are central, that would be reasonably expected to have been corroborated. And here, we have this whole story about the deed, and JALA, and all these things, and there's nothing to back up this story. And reasonably, you would think, well, you'd get a copy of the deed from the land commission, or, you know, just this is the deed, this is my land, because this is what it's all about. If you're saying that we, that there's an obligation for the IJ to provide notice, does that have to happen, you know, ten days before the IJ says, oh, by the way, I haven't heard anything about what your story is, but make sure that, you know, if it involves land, you bring the deed. If it involves this, I mean, could be the IJ heard the story and thought, you know, he came all this way, he's been in jail, it isn't really reasonable for him to have been able to corroborate anything. I mean, how do you know? Well, a couple of points to make. First, there were two pre-merits hearings here in October of 2008, and they just weren't really perfunctory. The immigration judge, as part of her job in developing the record, went through what she expected the applicant, who was represented by a different counsel at the time, went to discuss with the petitioner, discussed with the petitioner's counsel, what she expected him to bring. When the land issue did not come up, she said you have to bring the identity, because the identity was an issue not up on the petition. But he knew that he was relying upon a claim in the nature of economic persecution, and that economic persecution went to the taking, according to him, of his property, because he was Mandingo, and he considered the deed important enough to have called his mother to get it. He considered the deed important enough that when the land commission came in, he was concerned about not having a copy, and, I would add, that eventually he was able to obtain certain documentation, albeit false, that assisted him in this country, but apparently made no effort to secure a copy of the deed from the land commission in the registry in Liberia any further time prior to the hearing. Well, there's no reason to believe, first, there's no reason to believe the land commission would have provided that copy, given that it was long-term, decades ago. He could have tried. He could have tried. He warned his counsel at the time, and they advised him to try. But the important thing to remember here is, again, the pre-merits hearing, he was told what he had to bring. Where is that in the record, that he was specifically told and left out? It's in the joint appendix. It has the transcripts of both the October pre-merits hearing sessions, which happened October 2008. The full transcript. There are parts where he discusses, where the immigration judge asks about identity and how to provide this stuff in advance to be able to forensic analysis. If there's an expert report that the petitioner has to submit, you have to get the CVs in advance. You have to give the DHS a chance to respond. So there's a litany of things that the immigration judge told the petitioner's counsel would be needed. The land issue was never mentioned. If I could, let me take you to the third prong of asylum. Because even if we agree that the incidents rise to the level of persecution, and it's based on statutory protected ground, how do you show that the acts were committed by the government or forces the government is either unable or unwilling to control? Because, as I mentioned before, this is an ethnic battle. This is an ethnic battle that has been inextricably tied to the government for the past two decades. As the country materials from the Department of State, the United Nations, other third parties, that Mr. Dowell submitted in support of his claim made clear, and this is not just ancient history, while the land commission... You argue that the land commission is ineffective, but the government has established the land commission to try to resolve these disputes. But you can't... A government that has been active in persecution cannot simply... The change in government since the days of persecution changed. I mean, the Charles Taylor regime has been going on since 2003. That's true. But again, the materials that Mr. Dowell submitted on behalf of his claim that were current, 2007, 2008 materials from the United Nations, from the Department of State, from other third party sources, made clear that this sort of conflict, Mandingo Armando conflict, was still happening right up until the time of Mr. Dowell's departure. And if, upon remand, we can provide additional documentation of how this continues into 2011, how the land commission continues to be effective, there is no support for any notion that had he asked the land commission, had he stayed and waited for things to happen, as the immigration judge and respondents seem to argue, that anything would have been different, that his land would have been more durable. Do we disagree with you on that? Is there any reason to bring in this case? If we disagree... If we disagree with you on the third part. Well, it is a part of an assignment to his claim that has to be either... But, I mean, several cases, going back to the corroboration point, say when there's a lack of corroboration, when they violate the Abdullahi standard, when they violate the Chafee standard, that obligates the remand for further development of the factual record. That's in the Turei case, for example, and in the Shen case, ZHNJ. And it's also important to remember, going back to corroboration, that this is not a case for the immigration judge, even though she found it incredible, it's clear that she focused on the lack of corroboration in her opinion. And in the intervening months, since Mr. Dowell's petition for... Since his claims for relief were denied by the immigration judge, and more recently, since my firm took over as pro bono counsel in this case, we have obtained copies of the land deed. We overcame the obstacles, and there were obstacles to obtaining the... To taking that documentation, but we have it now, and upon remand, we can provide that to the immigration judge for further development of the factual record, so she can now undertake an analysis of the persecution in totality, both the land confiscation and the threats, the repeated threats, most prominently the two death threats within the months of 2008. And therefore, with the land deed in tow, she can then look at the claims in total, and look at each of the claims... Did you ask the government if they would agree to a remand for that purpose? Well, I did... I mean, I don't know that the briefing noted that you have since obtained the deed. I did not realize that. I do believe we did note that in both the open and the reply brief. It may have been a little bit... It was a diggle outside the record, so we aren't clear how much we should mention, but we did say we had obtained documentation that could provide corroboration of Mr. Dowell's claims. We did, before we filed our petitioner's brief, I did send an email to Mr. Angeles, his predecessor on his case, Mr. Bashoff, noting that we have obtained... Did you ask whether they would agree to remand? I did. I said we have obtained this. If you want to discuss, please call, and I did not follow up after that. So, on the issue of corroboration, we feel that... Oh, yes, your red light is on. I'm sorry. Thank you. Thank you. Counsel, what about an agreed remand now that the deed is in their possession? Your Honor, I've never spoken to the prison counsel about that. I've read that they have that in the papers. They've never approached us. I haven't spoken to my colleagues about that, and I can't give you that here today. If they actually have that or if they have any new evidence, I mean, there are procedures in the INA for seeking a motion to pre-open in front of the agency, and they can do that if they would like to. Okay. Thank you. Thank you. This is Court John Inglis for the United States. Your Honor, in this case, petitioner seeks asylum because of a land dispute with another individual in Liberia. Petitioner took the dispute to a land commission specifically created by the Liberian government to resolve an ambiguous land disputes. Petitioner subjectively decided five months after building the land commission that the land commission was taking too long and was ineffective. He therefore destroyed a building on disputed land. The immigration judge specifically, in this case, identified petitioner's ownership of the disputed land as a fact that would have to be corroborated. He asked petitioner at length why that fact was not corroborated, and then held that petitioner failed to carry his burden of proof because he failed to corroborate that claim. But wasn't his explanation, you know, somewhat reasonable? You know, he was in detention. It really was very tough for him to do these kinds of things. Why is that not a reasonable explanation? Your Honor, it's not a reasonable explanation because he actually still had a family in Monrovia. His cousin was in Monrovia, his wife was in Monrovia. He was still in contact with his mother in Guinea, bringing new people back in the area who could have tried to obtain a corroboration. Why didn't he say, you know, can I have a continuance file, you know, while we get it? If you really need it, I'll get it. But he should have said that, Your Honor. And the prior to the merits hearing, the immigration judge did provide petitioner time to obtain corroborating evidence. But now, is your opponent correct that I.J. went through this litany of what he's going to need, and she failed to mention, you know, you better have the deed? The immigration judge said that corroborating his identity was an important factor because he came in with false documents. Right. So before he could apply for a deed, he had to corroborate that he actually was, he said he was. Why does the deed matter so much anyway? Well, it was a piece of property, Your Honor, to establish that actually, that he actually owned it, that he's claiming that this is. Yeah, but you could have a deed. I mean, you could have a deed to some other piece of property. It was a deed, perhaps an affidavit from somebody else who, you know, with first-hand knowledge to say that he really owned it. Did the.I.J. say you're going to have to prove that you really own the land and you're going to have to have somebody else vouch for this story? Well, the.I.J. said that during the merits hearing, Your Honor. They went on it at length. It's 326 of the Administrative Right, I think that's 346 of the Joint Appendix. There was a pretty extensive colloquy there between the immigration judge and counsel. And ultimately, counsel's response was that the petitioner lost the faith. And that absent government is not sufficient reason for not obtaining corroboration and continuing. So the government contends that the immigration judge satisfied the three-step task that's set forth in Abdullah by identifying the documents, inquiring from the petitioner, and then analyzing that absence extensively. For that reason, the petitioner failed to carry his burden of proof. It's fully the government's position that the threats in this case can now rise to the level of persecution and that there is no economic persecution here. That the petitioner has not shown a severe economic disadvantage. And that because this is a land dispute, the petitioner has not established an access to protected ground. He has not established that most central reason for the persecution is ground protected pursuant to the IAM. And finally, I'll just mention that internal relocation in this case was petitioner's burden of proof because he did not establish grounds for persecution. He was able to relocate to Monrovia. The only problem he had in Monrovia was with respect to one other person in the Gaza section of Monrovia. That's not established that he was not able to live in the rest of Monrovia and or the rest of Monrovia. What about the third prong of asylum? Excuse me, Your Honor? What about the third prong of asylum? The third prong being? That the government was either unable or unwilling to control the people who committed the persecution. I think in this case, Your Honor, there's been a lot of reconciliation since 2003. But for this specific petitioner's case, there was a land reclamation committee that was created in Monrovia specifically for dealing with claims from Mandingo contested communities. Have they done anything? Presumably, they still have the deed and they're still considering this. Do you know that they have taken any action? Petitioner gave up on the process, Your Honor, after five months. So after five months, the fact that... Do we know that the land commission doesn't still have his issue before it? Your Honor, we do not know that. And that would have been something else that the petitioner could have brought to the court's attention if he carried this burden of proof. But as far as the government is concerned, he blew it up only in five months. And we don't know otherwise what they might have decided. Are there any further questions from the court? No, nothing further. Thank you, Your Honor. Thank you. Mr. Tiger? Just a couple of additional notes. Just answering your question from my first set, first colloquy, the joint witness numbers on the pre-merits hearing is JA-108 to JA-142. It covers two dates in October. You can get through that pretty quickly and you'll see what I'm talking about. Second, as Mr. Angeles noted, at the pre-merits hearing, he did provide his non-issue up here in the Third Circuit. Third, the government has talked about how the land confiscation didn't suffice for economic persecution. But this court again and again, for example, the Javaria case, said that you have to look at all the incidents of persecution in total. You can't look at the land issue and the threats in an atomized fashion. They're obviously inextricably connected here. His land was confiscated as part of a decades-long persecution by Mandink, built by Mano Tribesmen. And then because he stood up for himself and actually tried to reclaim his land, it was denied by the local magistrate who had previously rented the land for him. He was then threatened multiple times with death. One of the key moments, again, was two death threats in 2008. But prior to that, his safety and habitat in question always couched in ethnic times. When he first built the land, when he found out that Mr. Jha was building urban structure on it, the contractor, Mr. Jha, said, you Mandinkos think you're going to get this land back? So it's clear from the record that it's not based on substantial evidence that the persecution that's in question here was an issue of personal grievance. His Mandinko and Muslim status was one central reason for the persecution. And finally, the issue of relocation. As I mentioned, twice within a matter of months, he was threatened with death in an imminent and menacing fashion, once in his hometown of Gonda, second in the national capital of Liberia. This is a small country. He is now obligated, before he is granted asylum, to go to every town in the entire country to find a safe haven where he can survive. If he were to return to Liberia, there's little doubt that he would face imminent and menacing threats again. And this time, he may not be able to escape. Thus, he has a well-founded fear of future persecution, even if the threats before do not constitute past persecution, which we argue they do. This is clear. There are several cases that find well-founded fear, even though there's no past persecution. The Gomez-Uluwatu case, for example, does that. And I believe the Domsiek case from 2010 does that as well. Thank you, Your Honor. Thank you. And thank you, firm, for undertaking representation on a pro bono basis. Some great assistance for the court. Thank you, counsel. Cases, we'll argue, were taken under advisement.